778 N.W.2d 410 (2010)
279 Neb. 335
Lonnie L. KOCONTES, appellant,
v.
Sean K. McQUAID and Edward T. Bujanowski, appellees.
No. S-09-235.
Supreme Court of Nebraska.
January 29, 2010.
*413 James L. Beckmann, of Beckmann Law Offices, Lincoln, for appellant.
Raymond E. Walden, of Walden Law Office, and William R. Johnson, of Lamson, *414 Dugan & Murray, L.L.P., Omaha, for appellees.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
Lonnie L. Kocontes filed a claim for libel per se against Sean K. McQuaid and Edward T. Bujanowski after they submitted a letter to the Nebraska Board of Pardons discouraging it from granting Kocontes' application. The district court granted McQuaid and Bujanowski's motion to dismiss based on the absolute privilege protecting participants in judicial or quasi-judicial proceedings from the prospect of defamation actions. We consider whether the Board of Pardons is a quasi-judicial body such that absolute privilege applies to communications relating to its proceedings.

BACKGROUND
Kocontes is an attorney licensed in the State of California. Occasionally, Kocontes has represented clients on a pro hac vice basis in Florida. He has apparently been unable to obtain a license to practice law in Florida. This is at least in part because of drug-related felony convictions that occurred in Nebraska approximately 30 years ago. In the hopes of obtaining a license in Florida, Kocontes filed an application with the Nebraska Board of Pardons to pardon his prior convictions.
Kocontes' relationship with Bujanowski began sometime around September 2007, when Kocontes entered into a pro hac vice arrangement to represent him as the plaintiff in an action in Florida. By November, however, Kocontes' pro hac vice status had been revoked by the court. Kocontes asserts that the court had erroneously concluded that he was a Florida resident. Bujanowski retained McQuaid, a Florida attorney, to continue his lawsuit.
On January 28, 2008, Kocontes filed a complaint against McQuaid with the Florida State Bar, alleging that McQuaid had solicited Bujanowski at a time when Kocontes still represented Bujanowski. He also initiated a civil action in Florida against McQuaid and Bujanowski for defamation, alleging that McQuaid had made defamatory statements to Bujanowski in the process of soliciting his business and that both McQuaid and Bujanowski had made defamatory statements to an investigator in Bujanowski's lawsuit.
McQuaid and Bujanowski learned that Kocontes had a pending application for a pardon before the Nebraska Board of Pardons. They opposed the pardon, allegedly out of vindictiveness for Kocontes' suits against them. On March 6, 2008, McQuaid sent a letter on Bujanowski's behalf to the Board of Pardons. The letter described the relationship between the parties and alleged that (1) Kocontes' pro hac vice status in Florida was removed due to Kocontes' misrepresentations to the court, (2) Kocontes had lied about his convicted felon status when registering to vote in Florida, and (3) Kocontes was illegally practicing law in Florida and had charged exorbitant fees. Finally, the letter suggested that the Board of Pardons investigate specific rumors of illegal behavior for which Kocontes had not been charged or convicted. In the present action, Kocontes alleges that all of these statements to the Board of Pardons were false and that McQuaid and Bujanowski either knew of their falsity or acted with reckless disregard as to their truth or falsity.
Kocontes' application for a pardon was denied by the Board of Pardons on June 5, 2008. That same day, Kocontes filed suit *415 against McQuaid and Bujanowski in the district court for Lancaster County seeking damages for the alleged libelous statements in the letter.
McQuaid and Bujanowski filed a motion to dismiss the action, alleging that Nebraska lacked personal jurisdiction over them and that the action was barred by absolute privilege. McQuaid and Bujanowski were granted a protective order delaying the need to respond to Kocontes' discovery requests until the motion to dismiss was disposed of. The court denied Kocontes' motion to compel discovery to prove additional contacts and defamatory statements in Nebraska. Ultimately, the motion to dismiss was granted, with the district court's reasoning that an absolute privilege protected the statements. Kocontes appeals.

ASSIGNMENTS OF ERROR
Kocontes assigns that the district court erred when it (1) granted the motion to dismiss and (2) overruled Kocontes' motion to compel discovery.

STANDARD OF REVIEW
Whether a communication is privileged by reason of its character or the occasion on which it was made is a question of law.[1] An appellate court resolves questions of law independently of the determination reached by the court below.[2]
An appellate court reviews de novo a lower court's dismissal of a complaint for failure to state a claim.[3]
On appellate review, decisions regarding discovery are generally reviewed under an abuse of discretion standard.[4] A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[5]

ANALYSIS
Dismissal under Neb. Ct. R. Pldg. § 6-1112(b)(6) should be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.[6] When analyzing a lower court's dismissal of a complaint for failure to state a claim, an appellate court accepts the complaint's factual allegations as true and construes them in the light most favorable to the plaintiff.[7] In this case, the court determined that the statements were absolutely privileged and that therefore, even if the allegations in the complaint were true, the statements could not form the basis of a defamation action. The court also found that no reasonable possibility existed that Kocontes would be able to correct the deficiency in his petition.
On appeal, Kocontes asserts that absolute privilege should not apply to complaints to the Board of Pardons. He argues *416 that the Board of Pardons is not a quasi-judicial body and that, in any event, letters by strangers to the proceedings should not be protected by the privilege. Even if the letter was protected, Kocontes asserts he should have been allowed to amend his complaint to assert the tortious interference with a business expectancy. Finally, he asserts he should have been allowed to discover any possible nonprivileged communications made by McQuaid and Bujanowski with Nebraska.

ABSOLUTE PRIVILEGE
An absolutely privileged communication is one for which, by reason of the occasion on which it was made, no remedy exists in a civil action for libel or slander.[8] Absolute privilege attaches to defamatory statements made incident to, and in the course of, judicial or quasi-judicial proceedings if the defamatory matter has some relation to the proceedings.[9] The relevancy of the defamatory matter is not a technical legal relevancy but instead a general frame of reference and relationship to the subject matter of the action.[10]
Absolute privilege stems from a public policy determination that weighs the public interest in free disclosure against the harm to individuals who may be defamed.[11] There are certain relations of life in which it is so important that the persons engaged in them should be able to speak freely that the law takes the risk of their abusing the occasion and speaking maliciously as well as untruly.[12] As will be illustrated further below, the privilege applies to witness testimony in a judicial proceeding, but it also applies to statements preliminary or ancillary to judicial or quasi-judicial proceedings.
In Shummway v. Warrick,[13] we defined what is quasi-judicial for purposes of applying absolute privilege and held that "`[w]hen the law commits to any officer the duty of looking into facts and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial, the function is quasi-judicial.'" We note that several other courts use a similarly broad definition that focuses on the ability of a board or tribunal to decide matters based on the application of human judgment to some sort of factual investigation.[14]
Nevertheless, it has been said that there is "`"no clear definition" of what constitutes a quasi-judicial proceeding before a quasi-judicial body.'"[15] In addition to the definition set forth in Shummway, we also find useful six principal attributes considered by other courts in making a determination as to whether a body is quasi-judicial: (1) the power to exercise judgment and discretion; (2) the power to hear and determine or to ascertain facts *417 and decide; (3) the power to make a binding order and judgment; (4) the power to affect the personal or property rights of private persons; (5) the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of the issues at a hearing; and (6) the power to enforce decisions or impose penalties.[16] A quasi-judicial body need not possess all six powers, but the more powers it does possess, the more likely it is to be acting in a quasi-judicial manner.[17]
We have considered a wide variety of entities as quasi-judicial bodies for purposes of absolute privilege, although we have never before specifically addressed the Board of Pardons. For example, in Shummway,[18] we held the privilege applied to a letter written by a banker to the state banking board. The board was considering a businessman's application for a charter to start a new bank. In concluding that the board was quasi-judicial, we observed that it was charged with making the ultimate decision as to whether to grant a banking charter and it was charged with investigating and determining the integrity and responsibility of parties applying for the same.
We concluded that the banker's protest was relevant and that it was covered by the privilege, because statements addressing the integrity and responsibility of the applicant were pertinent to the board's inquiry. We held that the banker was protected by the privilege regardless of whether his rights and interests were directly involved in the matter before the board or whether his opinion was compelled by the board.[19] It was the banker's right to appear before the banking board and protest the issuance of the charter.[20] Thus, "it would be paradoxical to hold that he was merely an interloper, a stranger to the proceedings, and therefore denied the privileges and immunities granted a party litigant."[21]
In Sinnett v. Albert,[22] we held that absolute privilege applied to a complaint to the Nebraska State Bar Association against an attorney by a former client. We held that the complaint was privileged regardless of whether it was ever admitted into evidence at a subsequent investigatory proceeding. Furthermore, the protection extended to statements in the complaint that pertained to an attorney who was not, in fact, the ultimate subject of the disciplinary proceedings, so long as the statements were incidental or explanatory to the complaint.
We said that proceedings for the discipline or disbarment of attorneys have traditionally been regarded as judicial in character. And we described in some detail how "[r]easonable demands of sound public policy require[d] the imposition of absolute privilege"[23] to complaints about professional misconduct. We explained that the exercise of the right to lodge a complaint against an attorney "should not be discouraged by fear on the part of the complainant that he may have *418 to defend a lawsuit for defamation by anyone who deems himself defamed by relevant statements made in the complaint."[24]
In other jurisdictions, absolute privilege has likewise been applied to complaints before a wide variety of entities, ranging from a police department's internal affairs division[25] to a council of optometric education.[26] Closer to the situation at hand, communications to states' boards of parole are almost universally considered protected by absolute privilege.[27] For instance, in Pulkrabek v. Sletten,[28] the court applied the privilege to a letter written by the prosecuting attorney questioning the competency of defense counsel who had agreed to a plea bargain. The court held that the privilege applied to the letter regardless of whether it was actually used in the parole meeting so long as it was drafted with the intent that it be considered by the parole board in its investigation of the inmate's application for parole.
In Sullivan v. Smith,[29] the court held that absolute privilege applied to the testimony of the victim's parents at a parole board meeting. In concluding that the parole board was a quasi-judicial body, the court explained that the parole board did not normally act in a ministerial manner, but, instead, its decisions were "completely discretionary."[30] The board, the court explained, made decisions akin to those of a trial judge in determining the propriety of probation. In both instances, the determinations were effectively "not reviewable on appeal due to the complete discretion."[31] The court defined a "judicial" action for purposes of absolute privilege as an "`"`"[o]fficial action, the result of judgment or discretion...."'"'"[32]
Not many cases have specifically considered whether proceedings to obtain a pardon are quasi-judicial in this context.[33] As Kocontes points out, at least one case, decided in 1918, has denied the privilege.[34] In Andrews v. Gardiner,[35] the New York Court of Appeals considered whether a physician's application to the governor for a pardon of a prior conviction was absolutely privileged. The court explained that the application was not a proceeding in court, nor one before an officer having attributes similar to a court.[36] Instead, it was "a petition for mere grace and mercy":
It may be made by any one, and without the convict's knowledge. It grows out of the action of the courts, but it seeks to reverse their action by an appeal to motives and arguments which are not those of jurisprudence. There are no clearly defined issues. There is often a *419 most informal hearing. Sometimes there is argument by counsel. As often, the plea for mercy is made by wife or kin or friends.... It is not necessary that reason be convinced; it is enough that compassion is stirred.[37]
The court reasoned that "[w]here the test of the pertinent is so vague, there must be some check upon calumny."[38] Furthermore, the court found a distinction between a witness required to attend a hearing and voluntary complainants. The court concluded that there was "no license, under cover of such an occasion, to publish charges known to be false or put forward for revenge."[39]
In several other cases, however, courts have found that absolute privilege does apply to communications to a pardons board. In Cole v. Star Tribune,[40] the Minnesota Court of Appeals held that letters sent by the victim's nieces to the board of pardons were absolutely privileged. The board of pardons was considering an inmate's application for early release. The board consisted of the governor, the attorney general, and the chief justice. The court noted certain formalities, including the fact that the public had been informed of the meeting of the board. The victim's nieces, particularly, were informed and given the right to be present or to submit a written statement. The board was required by statute to consider the victim's nieces' statements, although there was apparently no further instruction as to the manner in which it was to do so. The court concluded the board of pardons was quasi-judicial because it applied "`deliberate human judgment based upon evidentiary facts of some sort commanding the exercise of... discretionary power.'"[41]
In Brech v. Seacat et al.,[42] the Supreme Court of South Dakota held that the privilege applied to a sentencing judge's letter to the board of pardons, regardless of whether the letter was required of him. It was customary for the sentencing judge to forward such a letter to the board. And in Connellee v. Blanton,[43] the court held that absolute privilege applied to allegedly libelous statements in a prisoner's application for pardon to the governor. The court in Connellee noted that the right to apply for redress of grievances was one embedded in the state constitution. And while it observed that some classes of communication to heads of governmental departments were considered only conditionally privileged, the court concluded that this was a quasi-judicial proceeding. The court explained that the same principle of public policy which supports absolute privilege in judicial proceedings should apply with equal force to petitions for the exercise of the pardoning power  a power which was "superior to that of the court which rendered the judgment of conviction."[44] The court reasoned: "If the judicial proceedings which culminated in the conviction were absolutely privileged, why should not the same immunity be extended to the petition to a higher power to annul that judgment ... ?"[45]
*420 We conclude that the cases applying the privilege to communications before boards of pardons provide the better-reasoned authority. In light of our definition set forth in Shummway,[46] the six-factor test applied by other courts, and the public policy reasons for absolute privilege, we conclude that the Nebraska Board of Pardons should be considered a quasi-judicial body for this purpose.
The Board of Pardons was created by Neb.Rev.Stat. § 83-1,126 (Reissue 2008). It consists of the Governor, the Attorney General, and the Secretary of State. By majority vote, the board has the statutory authority to remit fines and forfeitures and to grant respites, reprieves, pardons, or commutations for all criminal offenses except treason and impeachment.[47] Applications requesting specific relief must be considered by the board at its next regularly scheduled meeting.[48] The Board of Pardons must consult with the Board of Parole concerning the applications.[49] Also, pursuant to article I, § 28, of the Nebraska Constitution and Neb.Rev.Stat. § 81-1848 (Reissue 2008), any victim of a crime committed by the applicant must be informed of the pardon application and be allowed to submit a written statement for consideration at pardon proceedings.
The current policy and procedure guidelines of the Board of Pardons state that it is the board's policy to hold its hearings in accordance with the Open Meetings Act.[50] "The purpose of any such hearing is to afford the members of the Board [of Pardons] the opportunity to question the applicant or others, or to hear such statements and review such information as the Board believes may be helpful to it ...."[51] The guidelines explain that the board may review information concerning the crime, the seriousness of the crime, the impact upon the victim, and other issues, but it is not the function of the board to retry the case for purposes of determining guilt or innocence.[52] On "Presentation of information, testimony, and argument," the guidelines state in relevant part:
The Board [of Pardons] may hear testimony, whether or not offered under oath, and may received [sic] written statements and other information which the Board deems useful in the exercise of it's [sic] authority.... Ordinarily the applicant, or a representative of the applicant, will first present testimony, statements, or other information in support of the application, followed by the presentation of those appearing in opposition to the application. Correspondence received by any Board member shall be shared with the other members through Pardon Board staff.[53]
Section 83-1,129(3) states that while the hearings before the board are conducted "in an informal manner," a record of the proceedings must be made and preserved.
In its investigation of the facts relevant to the application, Neb.Rev.Stat. § 83-1,128 (Reissue 2008) provides that the Board of Pardons, "in the same manner *421 as similar process in the district court" has the power to issue subpoenas; to compel the attendance of witnesses and the production of books, papers, and other documents pertinent to the subject of an inquiry; and to administer oaths and take the testimony of persons under oath. The statute further provides that witnesses are subject to contempt for failure to attend or provide requested material when subpoenaed. And the statute provides that any person who knowingly testifies falsely or submits any false affidavit or deposition is "subject to the same orders and penalties to which a person before the district court is subject."
Thus, the law commits to the Board of Pardons the duty of looking into facts and acting upon them, and the board does not make decisions in a way which the law specifically directs, but in its discretion.[54] And regardless of whether it always sees fit to exercise them, the board clearly has all six powers considered indicative of a quasi-judicial body.
Kocontes argues that the Board of Pardons should not be considered quasi-judicial because its exercise of discretion is completely unconstrained. Kocontes points out that there are no specific facts it is directed by law to find, nor are there specified legal principles the board must apply to the facts it determines. In support of this argument, Kocontes makes reference to the reasoning of the court in Andrews.[55] But he also relies heavily on cases where we have considered if an administrative decision was made in the exercise of "judicial" functions such that it is reviewable by petition in error. In those cases, we stated that a board, tribunal, or officer exercises a judicial function "if it decides a dispute of adjudicative fact or if a statute requires it to act in a judicial manner."[56] We have defined "`[a]djudicative facts'" as those "which relate to a specific party and are adduced from formal proof."[57] Little has been said about "judicial manner."
In Sarpy Cty. Bd. of Comrs. v. Sarpy Cty. Land Reutil.,[58] the Nebraska Court of Appeals held that a decision by a county land reutilization commission to sell a piece of property was not subject to review by petition in error because the decision was too discretionary. The court noted that the statutes granting the commission its power[59] did not list the facts which must be determined or upon which its determination must depend. It was thus neither ministerial, judicial, nor quasi-judicial; "[r]ather, the decision . . . can only be seen as a matter of Commission policy or as a political decision of the Commission."[60] Later, in Ditter v. Nebraska Bd. of Parole,[61] the Court of Appeals similarly held that a decision by the Board of Parole during its review of an inmate's parole eligibility was not a "judicial" act subject to petition in error review, because it held *422 no hearing and no "adjudicative facts" were determined by the board.
We note that more recently, in Nicholson v. Red Willow Cty. Sch. Dist. No. 0170,[62] we held that a school district superintendent's determination, without a hearing, of the sufficiency of signatures in a petition to transfer real property from one district to another was a quasi-judicial function subject to petition in error review. And we overruled the prior case of Kosmicki v. Kowalski,[63] in which we had held that an action was not judicial because it involved no "adjudicative facts."
But regardless of whether the Board of Pardons' decisions would or would not qualify as "judicial" under our petition in error analysis, we find Kocontes' reliance on these cases misplaced. Whether a decision can be reviewed by petition in error involves different considerations than those involved in the question of whether participants in the proceedings should be protected by an absolute privilege. One of the considerations for a petition in error is whether the decision being reviewed has taken place in a way that would create a record for meaningful appellate review.[64] For absolute privilege, in contrast, policy considerations encouraging full disclosure are paramount. At least one court has expressly held that the test for whether an entity is quasi-judicial for the purpose of absolute privilege is a different test than the one used to determine if a decision is quasi-judicial for the purpose of a method of review.[65]
We find no support for Kocontes' argument that the facts to be considered by the board must be delineated by law in order for the entity to act in a quasi-judicial manner. We do agree that the board must be bound to apply its judgment to some form of factual determinations so that its decision is more than simply an arbitrary game of chance. But the Nebraska Board of Pardons is so bound. Section 83-1,127(4) states that the board must consult with the Board of Parole, and § 81-1848 implies that it must also consider written statements by the victim. Extensive powers are granted to the Board of Pardons to investigate all facts it deems relevant. Thus, although not bound by jurisprudence, the Board of Pardons clearly endeavors to exercise its discretion in a "judicial" manner insofar as it exercises its discretion in conjunction with a careful determination of relevant facts. And, as the court pointed out in Sullivan,[66] when it comes to certain sentencing decisions, judges themselves are allowed virtually unfettered discretion not only in the decision itself, but in what facts it considers relevant to that decision. Yet such actions are still considered "judicial."
Kocontes also argues that absolute privilege should not apply because proceedings of the Board of Pardons fail to provide any counterbalancing guarantees of truthfulness. Kocontes asserts that the key factor in deciding if absolute privilege applies is whether other safeguards exist that would encourage truthful statements and reveal and punish untruthful statements. He *423 notes that in judicial proceedings, witnesses that are protected by absolute privilege are also subjected to discovery, cross-examination, and potential perjury charges.
First, we find that such guarantees are not, as Kocontes suggests, wholly absent from proceedings before the Board of Pardons. While any hearing is an informal one, the applicant's version of events is given fair consideration. Furthermore, the board has the power to subpoena any witness it chooses. As already noted, any person subjected to this power is "subject to the same orders and penalties to which a person before the district court is subject"[67] for knowingly testifying falsely or submitting any false affidavit or deposition.
That the Board of Pardons did not exercise its subpoena powers in this instance or that it does not normally choose to exercise these powers is not decisive. Anyone presenting information to the board should be aware of the possibility that his or her statements may ultimately be subjected to this scrutiny. As such, untruthful, malicious statements are still discouraged. Even in the traditional litigation context, preliminary information by potential witnesses is covered by the privilege, regardless of whether the information is ultimately brought forth through sworn testimony and subjected to truth-seeking protections. To hold otherwise, the courts have explained, would defeat the purpose of the privilege, for there would be a chilling effect on potential witnesses' revealing what they know during the investigatory stages, and litigants would never know whether they should be called.[68] The evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth as is the presentation of such facts and opinions during the course of the trial.[69] The preliminary, investigatory stage of proceedings before the Board of Pardons is no less important.
Second, we disagree with Kocontes' emphasis on due process in determining whether the privilege applies. Many courts will consider the presence or absence of due process as a factor.[70] At least one court considers the "`"trappings required by due process"'" to be the primary consideration.[71] But this has never been the test in our court. Although we find the presence of other guarantees of trustworthiness relevant, we consider the guarantees provided by the Nebraska Board of Pardons sufficient in light of the other factors weighing in favor of absolute privilege.
As already discussed, "[t]he great underlying principle upon which the doctrine of privileged communications rests is public policy."[72] We conclude that there are very unique public policy reasons supporting absolute privilege for communications *424 to the Board of Pardons. A pardon is an act of "officially nullifying punishment or other legal consequences of a crime."[73] We have said that a pardon affects "the public interest in the conviction."[74] This is likewise true for the original trial. Society has an interest in the criminal justice system because it is what protects society from harm. And, as stated by the court in Connellee, "[i]f the judicial proceedings which culminated in the conviction were absolutely privileged, why should not the same immunity be extended to the petition to a higher power to annul that judgment . . . ?"[75] Stated another way, all the same reasons for applying the privilege to the proceedings that resulted in the conviction would also apply to proceedings to remove it. Before a convicted person benefits from the clemency power of the Board of Pardons, public policy demands full disclosure of any and all pertinent information. Absolute privilege helps ensure that the Board gets the information it needs to make this important decision affecting the public interest in convictions.
Having determined that the Board of Pardons is a quasi-judicial body, we consider McQuaid's and Bujanowski's statements to the Board as relevant and protected by absolute privilege. While Kocontes points out that they are not "parties" to the proceedings, it is the policy of the Board of Pardons to consider any statements or correspondence received.[76] As noted in Shummway, it would be "paradoxical"[77] to consider a citizen complainant a stranger to proceedings when the board grants the right to lodge complaints in relation to the proceedings.

AMENDMENT TO PLEADINGS
Kocontes next argues that even if he stated no claim for a cause of action for defamation, the district court abused its discretion in concluding that an amendment to his pleading could not cure the defect. His principal argument in this regard is that he should have been allowed to assert a claim for interference with a business expectancy. The district court implicitly determined that absolute privilege also barred such a claim.
The applicability of absolute privilege to the tort of interference with a business expectancy is an issue of first impression for this court. We observe, however, that the Court of Appeals has applied absolute privilege to claims of intentional infliction of emotional distress and to medical malpractice claims revolving around an allegedly false statement.[78] Most other jurisdictions to address this issue hold that the privilege applies as equally to defamation as it does to other tortious behavior, so long as the injury pleaded stemmed from the allegedly defamatory statement.[79] For purposes of *425 public policy, a defamation suit is indistinguishable from other tort-related claims seeking money damages for the statement.[80] If the policy which affords an absolute privilege in defamation actions "is really to mean anything[,] then [a court] must not permit its circumvention by affording an almost equally unrestricted action under a different label."[81] "The privilege would be lost if the [plaintiff] could merely drop the defamation causes of action and creatively replead a new cause of action."[82] We agree. We therefore conclude that the district court did not abuse its discretion in determining that no amendment to the pleadings would cure the defect in Kocontes' petition.

DISCOVERY
Finally, Kocontes asserts that the district court erred in denying his request for discovery. The court had postponed judgment on Kocontes' request pending determination of McQuaid and Bujanowski's motion to dismiss. Kocontes argues on appeal that he wanted to discover whether the defendants had made other defamatory statements in Nebraska that might not have been in a privileged context.
Kocontes refers to an affidavit submitted in support of his request. But the only indication of other communications in the affidavit is the following: "At the hearing I attended before the Nebraska Pardons Board in March 2008, the Nebraska Attorney General commented that he would be speaking to . . . McQuaid about me, apparently at . . . McQuaid's request." We find no reason why such a communication would not also be covered by the privilege. Although not written, it clearly involves communications with the Board of Pardons relevant to its ongoing proceedings. The district court apparently concluded the same.
The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion.[83] We find no abuse of discretion in this case.

CONCLUSION
For the foregoing reasons, we affirm the judgment of the district court.
AFFIRMED.
HEAVICAN, C.J., not participating.
NOTES
[1] Sullivan v. Smith, 925 So.2d 972 (Ala.Civ. App.2005).
[2] Tolliver v. Visiting Nurse Assn., 278 Neb. 532, 771 N.W.2d 908 (2009).
[3] Crane Sales & Serv. Co. v. Seneca Ins. Co., 276 Neb. 372, 754 N.W.2d 607 (2008).
[4] See Greenwalt v. Wal-Mart Stores, 253 Neb. 32, 567 N.W.2d 560 (1997).
[5] Id.
[6] Crane Sales & Service Co., Inc. v. Seneca Ins. Co., supra note 3.
[7] Id.
[8] Reagan v. Guardian Life Ins. Co., 140 Tex. 105, 166 S.W.2d 909 (1942).
[9] See, Kloch v. Ratcliffe, 221 Neb. 241, 375 N.W.2d 916 (1985); Sinnett v. Albert, 188 Neb. 176, 195 N.W.2d 506 (1972); Shummway v. Warrick, 108 Neb. 652, 189 N.W. 301 (1922); Restatement (Second) of Torts §§ 587 and 590A (1977).
[10] Sinnett v. Albert, supra note 9.
[11] See, e.g., Adams v. Peck, 288 Md. 1, 415 A.2d 292 (1980).
[12] Sinnett v. Albert, supra note 9.
[13] Shummway v. Warrick, supra note 9, 108 Neb. at 656, 189 N.W. at 302.
[14] Fedderwitz v. Lamb, 195 Ga. 691, 25 S.E.2d 414 (1943); Parker v. Kirkland, 298 Ill.App. 340, 18 N.E.2d 709 (1939); Cole v. Star Tribune, 581 N.W.2d 364 (Minn.App. 1998); Lane v. Port Terminal R.R. Ass'n, 821 S.W.2d 623 (Tex.App.1991).
[15] Vultaggio v. Yasko, 215 Wis.2d 326, 341, 572 N.W.2d 450, 456 (1998).
[16] See, e.g., Craig v. Stafford Const., Inc., 271 Conn. 78, 856 A.2d 372 (2004); Adco Services, Inc. v. Bullard, 256 Ill.App.3d 655, 628 N.E.2d 772, 195 Ill.Dec. 308 (1993).
[17] Illinois College of Optometry v. Labombarda, 910 F.Supp. 431 (N.D.Ill.1996). See, also, Craig v. Stafford Const., Inc., supra note 16; Adco Services, Inc. v. Bullard, supra note 16.
[18] Shummway v. Warrick, supra note 9.
[19] Id.
[20] Id.
[21] Id. at 657, 189 N.W. at 303.
[22] Sinnett v. Albert, supra note 9.
[23] Id. at 179, 195 N.W.2d at 509.
[24] Id.
[25] Craig v. Stafford Const., Inc., supra note 16.
[26] Illinois College of Optometry v. Labombarda, supra note 17.
[27] See, Sullivan v. Smith, supra note 1; Neal v. McCall, 134 Ga.App. 680, 215 S.E.2d 537 (1975); Hartford v. Hartford, 60 Mass.App. 446, 803 N.E.2d 334 (2004); Burgess v. Silverglat, 217 Mont. 186, 703 P.2d 854 (1985); Pulkrabek v. Sletten, 557 N.W.2d 225 (N.D. 1996); Vasquez v. Courtney, 276 Or. 1053, 557 P.2d 672 (1976). See, also, Inmates of Neb. Penal & Correctional v. Greenholtz, 436 F.Supp. 432 (D.Neb.1976).
[28] Pulkrabek v. Sletten, supra note 27.
[29] Sullivan v. Smith, supra note 1.
[30] Id. at 975.
[31] Id.
[32] Id. (emphasis omitted).
[33] Annot., 45 A.L.R.2d 1296 (1956).
[34] Andrews v. Gardiner, 224 N.Y. 440, 121 N.E. 341 (1918).
[35] Id.
[36] Id.
[37] Id. at 447, 121 N.E. at 343.
[38] Id. at 447-48, 121 N.E. at 343.
[39] Id. at 448, 121 N.E. at 344.
[40] Cole v. Star Tribune, supra note 14.
[41] Id. at 369.
[42] Brech v. Seacat et al., 84 S.D. 264, 170 N.W.2d 348 (1969).
[43] Connellee v. Blanton, 163 S.W. 404 (Tex. Civ.App.1914).
[44] Id. at 407.
[45] Id.
[46] Shummway v. Warrick, supra note 9.
[47] Neb.Rev.Stat. §§ 83-1,127(1) and 83-170(10) (Reissue 2008).
[48] Neb.Rev.Stat. §§ 83-1,129(3) and 83-1,130(1) (Reissue 2008).
[49] § 83-1,127(4).
[50] See, Neb.Rev.Stat. §§ 84-1407 through 84-1414 (Reissue 2008 & Supp. 2009); Nebraska Pardons Board Policy and Procedure Guidelines § 003.03 (1994).
[51] Nebraska Pardons Board Policy and Procedure Guidelines, supra note 50, § 004.03.
[52] Id., § 004.03C.
[53] Id.
[54] Shummway v. Warrick, supra note 9.
[55] Andrews v. Gardiner, supra note 34.
[56] See, e.g., Kropp v. Grand Island Pub. Sch. Dist. No. 2, 246 Neb. 138, 140, 517 N.W.2d 113, 115 (1994). See, also, Thomas v. Lincoln Public Schools, 228 Neb. 11, 421 N.W.2d 8 (1988).
[57] Hawkins v. City of Omaha, 261 Neb. 943, 953, 627 N.W.2d 118, 127 (2001).
[58] Sarpy Cty. Bd. of Comrs. v. Sarpy Cty. Land Reutil., 9 Neb.App. 552, 615 N.W.2d 490 (2000).
[59] See Neb.Rev.Stat. §§ 77-3205 and 77-3206(4) (Reissue 2009).
[60] Sarpy Cty. Bd. of Comrs. v. Sarpy Cty. Land Reutil., supra note 58, 9 Neb.App. at 561, 615 N.W.2d at 497.
[61] Ditter v. Nebraska Bd. of Parole, 11 Neb. App. 473, 481, 655 N.W.2d 43, 49 (2002).
[62] Nicholson v. Red Willow Cty. Sch. Dist. No. 0170, 270 Neb. 140, 699 N.W.2d 25 (2005).
[63] Kosmicki v. Kowalski, 184 Neb. 639, 171 N.W.2d 172 (1969).
[64] See Hawkins v. City of Omaha, supra note 57.
[65] Parker v. Kirkland, supra note 14. But see Vogel v. State, 187 Misc.2d 186, 721 N.Y.S.2d 901 (N.Y.Ct.Cl.2000).
[66] Sullivan v. Smith, supra note 1.
[67] § 83-1,128.
[68] See, e.g., Adams v. Peck, supra note 11.
[69] Reichardt v. Flynn, 374 Md. 361, 823 A.2d 566 (2003); Rabinowitz v. Wahrenberger, 406 N.J.Super. 126, 966 A.2d 1091 (2009).
[70] Boice v. Unisys Corp., 50 F.3d 1145 (2d Cir.1995); Kidwell v. General Motors Corp., 975 So.2d 503 (Fla.App.2007); Reichardt v. Flynn, supra note 69; Imperial v. Drapeau, 351 Md. 38, 716 A.2d 244 (1998); Hartford v. Hartford, supra note 27.
[71] Gregory Rockhouse Ranch v. Glenn's Water Well Serv., 144 N.M. 690, 697, 191 P.3d 548, 555 (N.M.App.2008).
[72] Martin L. Newell, The Law of Slander and Libel in Civil and Criminal Cases § 493 at 477 (Mason H. Newell ed., 3d ed. 1914).
[73] Black's Law Dictionary 1221 (9th ed. 2009).
[74] Campion v. Gillan, 79 Neb. 364, 372, 112 N.W. 585, 588 (1907).
[75] Connellee v. Blanton, supra note 43, 163 S.W. at 407.
[76] Nebraska Pardons Board Policy and Procedure Guidelines, supra note 50, § 004.03.
[77] Shummway v. Warrick, supra note 9, 108 Neb. at 657, 189 N.W. at 303.
[78] Drew v. Davidson, 12 Neb.App. 69, 667 N.W.2d 560 (2003).
[79] McLaughlin v. Copeland, 455 F.Supp. 749 (D.Del. 1978); Sweet v. Middlesex Mutual Insurance Company, 397 F.Supp. 1101 (D.N.H. 1975); People ex rel. Gallegos v. Pacific Lumber, 158 Cal.App.4th 950, 70 Cal.Rptr.3d 501 (2008); Buckhannon v. U.S. West Communications, 928 P.2d 1331 (Colo.App.1996); Levin, Middlebrooks v. U.S. Fire Ins. Co., 639 So.2d 606 (Fla.1994); Geick v. Kay, 236 Ill. App.3d 868, 603 N.E.2d 121, 177 Ill.Dec. 340 (1992); Jarvis v. Drake, 250 Kan. 645, 830 P.2d 23 (1992); Gray v. Central Bank & Trust Co., 562 S.W.2d 656 (Ky.App.1978); Visnick v. Caulfield, 73 Mass.App. 809, 901 N.E.2d 1261 (2009); Wild v. Rarig, 302 Minn. 419, 234 N.W.2d 775 (1975); Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 117 A.2d 889 (1955); Hernandez v. Hayes, 931 S.W.2d 648 (Tex.App.1996); Price v. Armour, 949 P.2d 1251 (Utah 1997).
[80] See McLaughlin v. Copeland, supra note 79.
[81] Rainier's Dairies v. Raritan Valley Farms, Inc., supra note 79, 19 N.J. at 564, 117 A.2d at 895.
[82] Hernandez v. Hayes, supra note 79, 931 S.W.2d at 654.
[83] In re Interest of R.R., 239 Neb. 250, 475 N.W.2d 518 (1991).